Good morning, Your Honors. My name is Michael Donahoe. I'm from the Federal Defender's Office in Helen. I'm here on behalf of my client, Mr. William Gollehon, who is on death row at the prison in Deer Lodge in Montana. We bring a number of claims to the Court. I'd like to address them in the order stated in the briefs, unless the Court has some other preference. And I'd like to begin at the beginning and start with the jury selection claim. I want to take this claim. I think I've argued enough. I just don't want to repeat what's in the briefs. If you don't mind a little focus, the cases seem to say that even in those days when the jury was not the sentencing arm, that it was proper to death qualify the jury because that might have some impact on the finding, the guilt phase of the trial. And in this case, that seems to have borne some fruit because at least one or two of the excluded jurors indicated in the colloquy that, in fact, it might affect their ability to look at the guilt phase. How do you frame that? How do you respond to that? All right, Your Honor. Respectfully, I need to quarrel with the supposition that the rule as stated was that the case is allowed or permitted or authorized or sanctioned discussion of the penalty with the jury. Well, isn't that what Lockhart v. McCree says? Well, I think it says that in the context of a death penalty case where the jury is going to perform both functions. They're going to weigh in on what the penalty is going to be. All of those cases from the inception, from Witherspoon forward, all discuss that paradigm. They're talking about a decider, a jury that's going to weigh in on the penalty phase of the case. This is not what was going on in Montana at the time. And I'll respectfully submit that that 1989 legislation that was passed post-Witherspoon, which came some years after Witherspoon in Montana, that essentially said straight away that you can discuss this aspect of the penalty with the jury, was wrong. It categorically went against sound and settled rules in the State of Montana that said that the penalty should not be discussed with the jury. Two cases clearly said that, that predated the trial in this case. So it's one thing to say that the Sixth Amendment fair cross-section and impartiality analysis shuts me down. I'll concede that. I don't think I have anything else I can do but that I concede that. But the simple fact is, is that that method of analysis, that modality of analysis does not apply here. You need to look at this, please, with a broader perspective. Now, let's talk about some generalities here. First, I want to move head on to Furman v. Wood. That case seems to be real difficult for us. It's decided by this Court. I'm looking at it right now, and it's controlling on us, isn't it? Well, I guess I want to make the argument that I can distinguish it. First, in Furman v. Wood, none of the arguments we make here today were addressed. There apparently was no such record. I think we should get some credit for, from the inception at jury selection, which is part of the trial proper, I think we should get some credit for registering the objection. I don't know that that was made in Furman v. Wood. I did go back and read the briefs there. I could determine whether it was or not. So that's a distinguishing feature. The second thing is, is that that's an AEDPA case. That's a way high standard that I'm certain the Court is aware, all right? That there needed to be some Supreme Court decision that said, no, this is wrong. That's not what's in play here. We can amalgamate decisions. We can look at the circuit law. We can do different things. This case is alive under pre-April 24th, 1996 decisions. What's your best case? You seem to be parsing the situation where the jury is not going to have sentencing authority from those where they would. What's your best case for saying constitutional violation to death qualify jurors in a capital case where the jury will not be doing the sentencing? Oddly enough, I think I'd say Ristanto v. Ross. It stands for the principle that it's a Supreme Court decision. It stands for the principle that people just don't have the right, parties just don't have the right in the trial of a criminal case to indiscriminately ask questions about what people think about certain things. This was an incendiary issue in this trial, and I knew that, and I knew that it was going to be from the inception. And I'll respectfully state that there was an indication that none of the jurors knew that it was a death penalty case. Precautions had been taken up to a certain point. There had been some press activity and so on, but there was no direct indication that the jurors themselves, that panel that we were going to select from, had any And I think that needs to be taken into account here, too. If you read this record, you can see that both the trial judge and the prosecutor, the prosecutor was nonplussed by it. I made the objection, and he said, well, geez, I just always thought we'd do that. I guess if you don't want to, that would be okay by us. Now, there has to be something in that. The trial judge made the record and said, as a matter of tactics, he doesn't want to go there. There might be some merit to that. And I submit to you that under Frank, this Court's decision in Frank, just discussing that penalty with the jury was the wrong thing to do. The cases, the general cases that talk about discussing the penalty, which aren't discussed in Furman v. Wood, talk about what that can do. It can lessen the burden of proof. It introduces irrelevant matters into the equation. It's a very dangerous thing. People are primed for that. We'll get to it later, but I make an argument here that we were acquitted on the deliberate homicide charge. Was this just some kind of, well, we have to settle for something. This was a real serious case. Somebody got killed here in a real serious manner. The answer to that question is, is we don't know. And I'll leave this issue with the goes back to Witherspoon days, actually, and was somewhat criticized by the Montana Supreme Court, and they picked up where the United States Supreme Court said, well, those studies have flaws in them. I want to respectfully argue that I submitted those studies, or we submitted those studies, just as an indication to show what can be done. And I was showing in a principled way that I had a justification for that tactical argument. And that's as far as it goes. I don't bear the onus, or we don't bear the onus, of proving the absolute truth of those studies. It's – it was good enough for us. It seemed to us that if we discussed the penalty with the jury, we were going to be in trouble. That's why we made the objection. And I think in the end, it bears that out. There is no case that I can cite that accounts for the tension between do not discuss the penalty with the jury and the Sixth Amendment and fair partiality cases. And the very last thing I'll say about this is, is that Judge Camby, when he writes Furman v. Wood, analyzes that all through the lens of Buchanan v. Kentucky. There are six Sixth Amendment due process-type considerations. And we're just trying to enlarge the scope here. The next issue that I will talk about quickly, unless there would be concerns, is the exhaustion on the notice claim. Make two contentions here. First, that we clearly exhausted it in direct appeal. Roberts. Detail how that was done. Well, we tried to set out in our blue brief in this Court what we set out in the blue brief in the Montana Supreme Court. Is this Claim 7? Yes, it is, Your Honor. And we cited Federal cases and made an argument under the rule of lenity. Actually, we did three things. We made a plain meaning argument and said that if you just read the legislation in its entirety, the accountability statute, the penalty statutes. And I guess I'll go right to a point that I think is important. I try a lot of cases in Federal court. Look at 18 U.S.C. Section 2. The penalty is in the section. You are beholden to the government for a penalty that's exactly the one that the principal would get. It says it right in the text of the legislation. It doesn't say that in Montana. District court denied this claim as unexhausted. Is that correct? It did, Your Honor. So what remedy are you looking to on this, on Claim 7? Well, I briefed both the procedural problem or the procedural issue and the merits of the claim, thinking that the Court would reach the merits. The district court rules it, the Federal district court rules it unexhausted. But, frankly, we just don't see how that can be. I mean, either it was exhausted in direct appeal or it had a minimum it was exhausted in post-conviction. Right. But suppose we agree with you, because that wasn't the COA says that the claim that we're supposed to be looking at is whether or not it's exhausted. So suppose we answer that question that, yes, it was exhausted. Well, if it was exhausted and I tried to think this through, I just didn't want to be I thought it was just comprehensive enough, the COA, that I just went ahead and did that. There's no question you did the right thing with regard to that. I'm just saying if we were determined that it was unexhausted, what would you have us do? Well, I guess my first inclination would be to send it back down. To the district court. Yes. And what would the district court do? And the district court would have to give a careful and studied analysis of the notice issue and render a decision on it. And if necessary, we would come back here. I assume that oh, sorry. Go ahead. Well, I was just going to say that's because the State has the State really had a fair opportunity to brief it. They haven't. Okay. And they've resisted it throughout. And I think that they would have points that they would want to make. I mean, they rested and I can't fault them for that. The first ruling was that it was unexhausted. We just repeatedly kept trying to get beyond that but never did. Is there enough of a record which would allow us to look at the merits? You know, I'm inclined to say yes to that, Your Honor, but I think that the record could be further clarified. And I think that would be a good thing. And if the court was inclined to send it back down, I think that would be the best procedure. So I'll leave those two claims and move on to the double jeopardy collateral estoppel claim. I'll make a concession here. This is a tough go in some ways for us because it's hard to understand. I have read these cases repeatedly and some of them are just so wispy, they're just difficult to comprehend. But I think the state law controls on this issue, doesn't it? Well, that's added into the mix. I think that's what complicates the argument. If you want to draw a line in the sand, that's a good place to start. But I think that the nature of the claim that makes it sort of amorphous is, well, what actually went on here, though? What was it that said, if we think about in the wider context of the notice claim, what was it that said that the death penalty was applicable to homicide by accountability? If there's a question there, then I think that impacts the analysis here. No, refresh me on what the co-defendant, was he convicted on, which one was he convicted on or not? No, they were both convicted, Your Honor, of homicide by accountability. And the not guilty verdicts were marked as to each defendant for deliberate homicide for count one. Okay. So each defendant was excused, at least on that verdict sheet, from the homicide by accountability trial. So the hypothesis, the explanation could be they couldn't figure out who actually delivered the last blow, but believed that both had participated. That's fair. But with the qualification, and I guess I want to talk about Scherer v. Farley and Shedd v. Arizona, I think that's where this issue gets resolved here. The thing that makes this case different is that you have to draw into it what respondent, what the prosecution did here with these charges. And if you think this through from the beginning, it's actually kind of interesting to think about it. They're charged with deliberate homicide, and we go on through the case for a little bit. And we're working our case and they're working theirs. And the prosecutor, who was a very good prosecutor, he was a very able lawyer, Mr. Connor, he's thinking, well, geez, you know, this could be one of those situations where maybe each blames the other or the jury can't figure out who did what. And suffice it to say he wants to add this charge, so he comes in with this amended information. And I think it's important if State law controls here that it should control all the way around. I think the only case that really discussed this maybe was Duncan. That was the Montana Supreme Court decision that might have some applicability here, but I have misgivings about that. But in any case, the alternative nature of the charge, I think, in the Duncan case indicates that it's one count. You can find deliberate homicide in this one count alternatively, either on an accountability theory or straight up that he did it. Doesn't matter. It's within the confines of one count. The technical aspects of this prosecution didn't allow for that, because when the information was amended, they broke it into two counts. And from there, the government goes and gives jury instructions and makes arguments proper to the jury at the summation of the case and says, do it one way or the other. You have a choice here, one way or the other. Convict him of the deliberate homicide or convict him of the accountability theory, but don't convict him of both. And respectfully, my argument here is if you give a careful reading to Shad and to Shad, your instructions and the style of the charge can have a major impact on how this issue gets analyzed. And if you do that, what happens here is that maybe there was a prosecutorial error, and I don't mean a misconduct variety, just a charging error. Maybe there was, but under anybody's analysis, the jury had the question put them as an equation, so to speak. Either find this or find that, but don't find both. And they just followed the instructions. Now, the aggravator that was noticed up here was deliberate homicide. In the sentencing phase, the State had to prove not deliberate homicide by accountability, and then again we get rewired into the notice argument, but suffice it to say that they had to prove deliberate homicide. Well, you look at the jury verdict, it says they're not guilty of that. So how can the judge reconfigure that in the context of the sentencing when the jury has already said, no, he's not guilty of that? Neither of them purposely or knowingly killed the guy. But aren't they the same crime, but just different theories of liability for the crime? They are, Your Honor, and I think the Shad decision in Shearer v. Farley fleshes that out. Justice Souter, I think, explains that. It was the most cogent explanation of what went on there. But if you look at the Arizona legislation and the way that case was charged and the way the law, the condition of the State law at the time, it's very different than what went on here. And I think those differences mean something here. It's not just something to say, well, we're the Montana Supreme Court and it's a death penalty eligible offense because we say so. It has to be with some authority at some point in time to say so. And I guess I'll just leave that there. The remaining issues in one incarnation or another involve essentially nondisclosure of evidence. Just before you move to that, at what point in the trial proceedings did the government make amend the information? Your Honor, I want to say that was like May of that year. I want to say that the first information pended about six weeks, five weeks. Was it during the trial? No, it was not. It was prior to the trial? It was prior to the trial. It was. Actually, there was a pretty good chunk of time there before the trial. Some four or five months, probably. All right. These last claims deal with this nondisclosure of evidence. And I actually think that in some measure that these claims are set out pretty well in the briefs. But I guess what I'd like to focus here on is the October 17th letter of Mr. Armstrong. And we've been arguing this just repeatedly, and every jurist to lay eyes on it just says, no, it doesn't mean anything. If you look at this letter over and against the trial testimony, there's no material distinction. And we emphatically come to the Court and please ask the Court to give that a careful read and recognize that there are material distinctions. When the man was cross-examined at the trial, he was asked categorically more than once, were you, did you ask for anything? Was anything given to you? And we got this, no, other than guaranteed safety. Now, everybody that has looked at this claim since the letter was disclosed in 1997 says, well, he said that. That's what he said. He said that he was promised guaranteed safety. So mocks Nix. He's just telling you what he got. And it happened to include maybe the release from prison. The Montana Supreme Court says that. They make that remark, by the way, in passing. They say, we recognize that some extraordinary help was given to this gentleman to get him out of prison. But nonetheless, at the trial proper, he said he was getting guaranteed safety and that's what he was getting at the time and that's all he was entitled to. What's the prejudice in this particular issue here? What's the prejudice to the defendant? All right. In terms of that letter? Yeah. All right. If we speak retrospectively and say we have the trial tomorrow, that letter means all the difference in the world to us because I get to tell him or have him read what his prior testimony was at the first trial and say, yeah, you wrote this letter 70 days after the verdict on October 24th and you had you registered some complaints and they were directed to whom? To the prison authorities and you didn't get things that you claimed you were entitled to. I just can't see or we just can't see how that could not make a material difference in the outcome of this trial. Well, wasn't there impeachment evidence introduced against Armstrong anyway? There was, Your Honor. And I guess that's the disappointing aspect of the analysis to date. Everybody sees them as functional equivalents. And this is a pretty nuanced explanation of what he thinks he was entitled to. And he says, and Armstrong in the letter, I asked for that before ever coming here. That's a very telling statement. He's in the county jail. Now, at the trial, he says I really didn't ask for anything. I just wanted to come forward. No, he said he wanted to be safe. He wanted to be safe. But the point I was going to make, Your Honor, is that the prosecution picks up on that apparent need for safety and parlays that into this sort of double-barreled argument, the safety and the goodness of the act in coming forward. And that is just stressed at the trial, how upstanding this individual was. And I think you have to take account of the fact that the government knew going into it that he was going to be attacked, and they took the precaution, the case-in-chief precaution of bringing a lot of that evidence out on the case-in-chief and say, yeah, you've done this and you've done this and you've had this problem and you've had that problem, but it's a new day, isn't it, Mr. Armstrong? And they laid that floor. They built that structure. And none of it was true. And that letter shows that. And disclosure of it was just absolutely essential. And then you think about the timing of it, how it compromised us all along the way. We went through the entire direct appeal process and had no knowledge that that letter existed. None. And if it had been disclosed a couple of days after it had been received, we still would have been in time for a new trial motion. And the cases in this circuit say that's a critical stage of a criminal prosecution. Thank you, counsel. You can reserve your remaining time if you wish. Thank you. We'll hear from the State. May it please the Court. My name is John Paulson. I'm an assistant attorney general for the State of Montana, representing the respondent, Mike Mahoney, the warden of the Montana State Prison, in this habeas case. There are three orders by Judge Lovell that are at issue in this appeal, two concerning the exhaustion issue. He ruled a second time on petitioner's motion for reconsideration. And then, of course, the main order of January 2005, which discusses the merits of the exhausted claims. I'd like to turn initially to the discussion on the issue of death qualification and the holdings of Montana Supreme Court and the concurrence by Judge Lovell that the seminal cases, Witherspoon, Adams, McCree, all apply to situations where the jury is not involved in the sentencing decision. I think this decision was appropriate under the circumstances. Montana, of course, does not have jury sentencing in capital cases even today. Arizona did at one point in time. And before they amended their statute, there were some cases arising with this same issue. And I think there are a couple of cases pending before the Court, or at least in the COA stage, that may come up to the Court eventually with this issue concerning death qualification of juries with non-sentencing obligations in capital cases. I came across two in my research, the Gilbranson case and the Van Adams case, out of the District Court in Arizona. In any event, there are several things that are clear from the record that were the basis for the decisions by Judge Lovell and also by the Montana Supreme Court. First of all, death qualification is specifically provided under Montana law. And the statute that the district judge, the trial judge, relied upon codifies the Witherspoon rule as discussed further in With, Adams, and McCree. And Judge Lovell's order recognizes that there are situations, even though the jury is not involved in the sentencing phase of the trial, there are situations, narrow situations, and the Court construed the statute narrowly, where some jurors simply may not apply the law to the facts in order to obstruct the death penalty at the inception. And this is a two-way street. Is it possible that there are jurors who are trigger-happy with respect to the death penalty? That could be, Your Honor. And I think the purpose of voir dire is to eliminate those jurors as well. The courts that have looked at this, and admittedly, there is no United States Supreme Court decision that is right on point with respect to this issue. Well, why don't you talk about the Furman v. Wood case. You heard Mr. Mahoney's effort to distinguish that. It's a Ninth Circuit case. What's your response to his efforts to distinguish it? Well, I think the case does control the issue here, although, again, the issue is not squarely presented in Furman. But I think this Court made clear that death qualification at the guilt phase is appropriate, is constitutional, does not violate the due process clause. And I think that the district judge's interpretation of not only Furman, but also the preceding cases, is a correct analysis of the law. There simply is no federal law that supports the petitioner's argument here. And Judge Lovell recognized that. The Montana Supreme Court's decision is consistent with Judge Lovell's view on that point. And one final point that the Respondent made in the brief was that there is no federal   And one final point that the Respondent made in the brief was that if, in fact, this Court were to recognize a different rule here, that somehow there was a due process right, as Gullahan or the petitioner asserts, to have a jury completely untainted by any discussion of the penalty whatsoever, that that would effectively be a new rule under Teague, and application in this case would not be appropriate. I'd like to turn to the notice issue, if the Court has no further questions on the death qualification issue. No, I think you're wise to address the notice issue. That's a very significant issue in this case. The exhaustion. Yes. Yes.  The merits of Claim 7. You found it unexhausted. To be unexhausted. That's correct. Judge Lovell did not address the merits of Claim 7. The merits have never been addressed by any court. Montana Supreme Court did not address the merits of this due process fair notice claim. So what are we to review? There's nothing in the way of court order for this Court to review other than Judge Lovell's claim was unexhausted and therefore procedurally barred. If we determine that it was exhausted, what should we do? I would agree with counsel that I think the correct remedy would be a remand to Judge Lovell to consider the merits of the claim. I don't think the Court – I'm not sure if it's a matter of jurisdiction or just simple prudence, I guess. The Court doesn't have anything in the record by which it could address the merits of this claim. The history of this claim is discussed at some length in the briefs, and I'll not go into that in great detail unless the Court desires to hear more information about it. Well, is there anything you can say in response to Mr. Mahoney's position that it was exhausted? Well, I think Judge Lovell's order is pretty clear that he agrees that it was not exhausted, and he looks at what happened in the Montana Supreme Court with respect to this issue initially. The claim was set up initially as a statutory construction claim. He, that is, the Petitioner, argued that under Montana law that there was simply no way that the statute could be interpreted to allow for application of the death penalty to what he considered to be a separate offense, deliberate homicide by accountability. He argued that the statute should be construed in that manner, looking at it on its face, and that if there was some ambiguity in the statute, that that ambiguity should be resolved in his favor because he was entitled to the rule of lenity. You know, I find this, the question on exhaustion is close, but what the Montana State Supreme Court actually said on that is a little bit bizarre. It says, we declined to rule again on this issue, which suggests that it had previously ruled on the issue on the direct appeal, which means that the claim was exhausted. I don't see how the Montana State Supreme Court can have it both ways on that. It was either in front of it, and they're declining to rule again, or it wasn't in front of it, and so they can say it wasn't previously raised, but they can't say it was both. The Court indicated that it would not reconsider this issue or, again, look at it, I guess. I don't have the quote in front of me. We declined to again address these issues. Close conviction relief is not available upon claims that a Petitioner could have raised on direct appeal if he failed to adequately raise it. He's barred now. If they were adequately raised, then res judicata bars it. Yes. I believe the Montana Supreme Court was essentially stating that it recognized the Petitioner's argument that the Petitioner was asking the Court for an appeal and opinion which would bind the Federal District Judge with respect to the exhaustion issue, and the Court accepted the Respondent's argument that the Montana Supreme Court did not have to go down that path. There were State law reasons why this issue was not properly presented in the context of a post-conviction proceeding, and the Court recognized there were two reasons that would preclude consideration of the issue in the context of the post-conviction proceeding. One was that if the claim was not raised and was before it in the post-conviction proceeding, that the claim was procedurally barred because it could have been raised in the context of the direct appeal. The second was that if arguably the claim had been raised and looking back at the post-conviction proceeding, it would preclude that, yes, that due process argument was in some sense fairly presented to the Montana Supreme Court, that consideration of the issue in post-conviction would be barred by the doctrine of res judicata. The Court did not go down the path that the Petitioner wanted the Court to take here, and I think that acknowledges that the issue of exhaustion is essentially a Federal issue. It's for the Federal judge to decide, based on the pleadings and the Court's analysis of what has happened, what has transpired in the State courts, and the expressed words and arguments presented in the underlying State court proceedings. But what's the guidance to the Federal judge if, just to follow your approach here? The Federal judge, of course, has a lot of guidance on the exhaustion issue from this Court's precedent and decisions by the United States Supreme Court. Essentially, it's a fair presentation analysis. Did the Petitioner present the facts in the law which underlie this Federal claim to the State courts as a matter of first impression to allow the State courts to consider it? And Judge Lovell concluded that the Petitioner did not, that there's nothing in his argument to the Montana Supreme Court that could be construed as a fair presentation of this issue to the State court for its resolution, and it's clear that the State court did not address the issue. The issue is addressed tangentially in the dissent by then Justice Carla Gray, now Chief Justice Carla Gray, but only in the context of the application of the rule of lenity and her discussion of why Gullahan should be entitled to the benefit of that rule. So the notice requirement was not, or issue rather, was not at all addressed by the Montana Supreme Court. And I think Judge Lovell's decision on this issue is reasonable and based upon a good understanding of the pleadings in the District Court, or the State District Court and the Montana Supreme Court. Again, I don't think that this Court's certificate of appealability with respect to issue or Claim 7 extends to the merits. And again, if the Court were to disagree with Judge Lovell and find that this issue was exhausted, the proper remedy would be a remand for consideration of it. Well, we understand, counsel. Anything further? Not on the notice issue, Your Honor. All right. With respect to the double jeopardy argument that was raised by the counsel, and questioned by the Court, I agree with Your Honor that state law does control this issue. And the Montana Supreme Court has stated clearly, the majority in Gullahan's direct appeal, that deliberate homicide and deliberate homicide by accountability are essentially one offense. They're not two separate offenses. Accountability is a theory, mechanism, conduit, the language. So why was it charged as two counts? It was charged as alternative theories of holding Gullahan and his co-defendant, Douglas Turner, responsible for this crime. The prosecutor recognized that the state's forensic evidence could not clearly establish which blow was the fatal blow. There were a couple of blows that could have caused the death of Gerald Pelleggi. And the state's eyewitness testimony could not accurately pin the fatal blows to one defendant or the other. And in this context, the prosecutor opted to amend the information. Incidentally, it was amended well in advance of trial in May of 1991. And the prosecutor argued and the jury was instructed that they could convict either or both defendants under one theory or the other. They could not convict the defendants of both charges. And the jury was instructed to find the defendant, if they found the defendant guilty, to find the defendant guilty of one offense and not guilty with respect to the other. That's what the jury did. And Montana Supreme Court's interpretation of Montana law makes it clear that this was an appropriate way to charge the offense. And the jury's not guilty verdict with respect to the deliberate homicide charge certainly did not amount to double jeopardy with respect to its conviction of the charge under the accountability theory. That view of the accountability statute, I think, has been reinforced by the Montana Supreme Court in numerous decisions since that time. And those cases are cited in the Respondent's Brief. Unless the Court has other questions on double jeopardy, I'll turn very quickly to No questions, Counsel. to the Brady issue, the final issue argued by Counsel. In brief summary, the Court, both Judge Lowell and the Montana Supreme Court found that there were no pretrial undisclosed agreements that would implicate Brady. And what about the letter? That's the The letter of October 24, 1991, of course, was written after the trial. I understand Counsel's argument that somehow this suggested that there was, in fact, some kind of pretrial understanding that J.D. Armstrong, the eyewitness, would be housed at the county jail. Let me just put this in the context of what the sentencing court knew, what the jury knew at the time. Armstrong came forward about three months after the homicide in January of 1991 and told the authorities that he knew what had happened. At that point in time, he was removed from the state prison in Deer Lodge and taken to the Powell County Jail. And he remained there, more or less in solitary confinement at the county jail, for about eight or nine months until the trial. While he was in the jail in July, he wrote a letter to prison authorities asking them to consider reclassifying him so he could become a trustee at the jail. And this letter was made known to defense counsel. The letter that came after the trial, the trial was in Was there a response to that letter? Yes. The prison authorities said, no, we're not going to change your classification. And they declined his request. And that response was pretrial? That response was pretrial. That's correct, Your Honor. Armstrong testified at the trial, which was in late September, early October, about a week or so after the prison riot in the case. And following his testimony, he did write a letter, again asking for trustee status. And there is admitted ambiguity in that letter with respect to certain references. There's a reference to Assistant Warden Gary Weir saying, we can do it. And the petitioner thinks that this is a reference to some kind of a promise to retain Armstrong at the county jail and that this was a pretrial, an agreement to retain him at the county jail as opposed to housing him at the state prison. Where was Gullahan housed at the time? Gullahan was housed at the maximum security unit of the Montana State Prison. During the trial? During the trial. Because I assume that it's a benefit to be at the county jail over being in the state prison. It was certainly a safer place for Armstrong. As Judge Lovell pointed out, it's no destination spot. The privileges that you have at the county jail certainly aren't any better, any greater than at the state prison. In fact, under the circumstances, Armstrong had to give up quite a few of his privileges with respect to his movement and his activities simply by being in the county jail. But he was there and he was not very happy with the fact that he did not receive trustee status. And so this letter was simply another request that he made to attempt to get trustee status for himself. When he was deposed in the context of the state post-conviction proceedings, he testified at some length about this letter and confirmed that, no, there had not been any promise to confine him in any particular location made before the trial. In fact, there really wasn't any promise made after trial. He hoped that he would not go back to the state prison. And and the prosecutor, John Connor, thought that it was not going to happen. It turned out that it did happen, at least for a short period of time. After Armstrong violated the rules at the county jail, he was taken back and held at the infirmary at the state prison. And then a few months later, he was transferred out of state to a prison facility in Washington. But the point is that Armstrong never said that there was any promise to housing that at the county jail in Powell County or anywhere else in any other facility. And in fact, there's nothing in the record to suggest that there was anything other than a guarantee of safety that was given to either. William Arno or to J.D. Armstrong in connection with this case. Counsel, I think we understand your argument on that point. Okay, thank you, Your Honor. Does the court have any further questions? No further questions. Thank you, Counsel. Thank you, Your Honor. Mr. Mahoney, you have some reserve time. Your Honor, as to the first claim, it's not groundbreaking in the due process sense that the state needs to follow its own rules. That's been a rule of this Court for a long, long time. And that's basically what the essence of the death qualification is. And on the exhaustion question, I would like to respectfully point out in reply that the Montana Supreme Court adopted the wording proposed by the government counsel in making that exhaustion ruling. And that was inconsistent with the position that had been previously taken in Federal Court. In Federal Court before Judge Lovell, Respondent took the position that the claim was procedurally defaulted and was not exhausted. There was no mention of possible race judicata. There couldn't be, because that would have opened the door to some kind of exhaustion. And so it was put in this ambivalent posture over in the Montana Supreme Court, and they adopted that ruling. Do you have a specific comment with respect to the passage that Judge Wardlaw read? Well, under the cases we cited, in particular the last 28-J letter that we lodged, if there's a possibility that it was race judicata, then the Court is essentially saying that there's a possibility that it was addressed in the context of the direct appeal, which would mean it was exhausted. And in any case, the claim was clearly fairly presented in the context of the post-conviction. And there was no down-the-middle procedural default ruling by the Montana Supreme Court in that context. They just didn't rule address it in that way, even though it seems to me when you cite the 14th Amendment due process, fair warning, United States v. Basque, and the rule of lenity, that there's an issue there that's being raised. Maybe not perfectly worded, but then the Montana Supreme Court just didn't address it. Right. And I agree with that. And the last thing, just real briefly, is that with this Armstrong business, you know, it's easy to determine sometimes when an actor or two in a criminal context misbehaves, you know, because there's a paper trail, there's evidence, there's a fingerprint, you know, there's a blood spatter, there's this, there's that. And I don't mean to be sinister here, but, you know, when you get dealing with the monolithic organization of the government, it's hard to keep track of things. Armstrong talked to many people. If you looked at the trial testimony, you would see that when he was initially interviewed, it was by a group of persons, prison, law enforcement, those kinds of people. And he made the categorical assertion at the trial that he was never offered, there was never any quid pro quo. That is impeached by that letter, and in no uncertain terms. I was told before I came here that I wanted X, Y, and Z, and I was told we can do that, I would have that. And that is a material distinction, and I'm pleased to ask the Court to keep that in mind. Thank you. Thank you, counsel. The case just argued will be submitted for decision.
judges: O'scannlain, Hawkins, Wardlaw